IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No.  21-CR-367 |
| | : | |
| **v.** | : | |
| | : | |
| MICHAEL BARONE, | : | |
|       Defendant | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

WHO IS MICHAEL BARONE?

In May 2016, Mike Barone left his job as a New York City train conductor.  He had never been in trouble with the law.  After eight years on the job, he resigned so he could stay at home with his ailing father who was awaiting a kidney transplant and undergoing frequent dialysis.  They lived in a small apartment in Queens, New York, where Mike had resided all his life.  Mike became full time caretaker, doing all the cooking, cleaning, shopping, and round-the-clock care of his father.  They did not own a car and Mike had little savings.  They awaited his father's pension and social security but Mike knew those would be insufficient to support them both completely.  Mike began looking for a way to make additional income while remaining at home with his father.  He had only a GED and a 10 year-old computer repair certificate, and had never worked in the computer field, but tinkered with computers as a hobby.  But now that he'd left his conductor job, he had the benefit of time and interest to study up.  So he sat on his computer in the apartment and began reading up on jobs for tech support that allowed working from home.  Along the way, he began reading about a new kind of television service called "IPTV."  He came upon a chat room belonging to Omar Carrasquillo wherein Carrasquillo was

1

advertising his subscription service of providing TV channels through his company called "Reboot." Mike began watching YouTube videos of Carrasquillo and many others who were discussing the pros and cons of IPTV and how it operated. Carrasquillo, in particular, offered detailed analysis of the legalities of IPTV and insisted that the new creators of IPTV were maneuvering around the antiquated laws governing copyright protected television and movie content. Mike calculated the fees that he and his father were paying for regular Verizon Fios TV service in New York and decided to sign up as a customer for this "alternative" TV service which claimed to offer a series of popular channels at a drastically lower monthly price. And so he became a customer of IPTV, signing up for one month of Carrasquillo's service.

      Knowing that the service was new and operating with unique technology, Mike decided to join the company's chat room so that he could obtain tech support if needed. It turned out that Carrasquillo's IPTV service regularly had tech issues and channels regularly were down. Mike followed the discussions in the chat rooms and eventually even began answering questions and sharing information with other customers to make the service work for them. While he lacked any inside knowledge of the company, he learned enough by troubleshooting for himself to be able to assist others who had the same questions. He also had some familiarity with Kodi, the main platform for the IPTV companies. He studied the many YouTube videos that Carrasquillo posted on his own YouTube channel, and others who did the same, wherein they explained the technology and urged people to reject the major cable companies in favor of the "alternative," low-cost IPTV. Mike enjoyed helping others in the chat rooms and his efforts eventually caught the attention of Carrasquillo, who offered Mike a job as a moderator for Reboot, wherein he would get paid to answer tickets, *i.e* requests from customers for tech support. He could work remotely from home, was paid 25 cents per support ticket, and was

expected to answer questions as timely as possible. Most of the questions related to trouble logging in, expired passcodes, and similar issues. If Mike could not fix the problem, he would escalate the question to a higher level of tech support. This initial job paid him $250 to $500 per week. Carrasquillo would send electronic payment to Mike through Paypal and similar means. However, there were aspects to Mike's hiring that suggested it was not entirely legitimate--there was no job interview and Mike did not meet Carrasquillo in person[1] or through videoconference, there were no W4 forms to sign, no benefits offered, and certainly no company handbook.

Once he began as a moderator, Mike began studying the ways that Carrasquillo was earning income and it appeared he was earning income from his YouTube tutorials through paid advertising, and gradually increased that income through the Reboot IPTV system. It was apparent that Carrasquillo had learned that by creating media hype and self-serving videos on YouTube and elsewhere, he could bolster his following, which could lead to more customer acquisition. Carrasquillo made clear to Mike that his goal was to increase the number of subscribers to his IPTV and that Mike's role within that was to keep customers happy with the service. Carrasquillo would occasionally call Mike to resolve challenging tech questions for a customer, and Mike frequently would log in to Carrasquillo's live discussions in Google hangouts.[2]

After a week or so of working as a moderator, Carrasquillo appointed Mike as an administrator, a higher role, with more access to inside information for helping customers through technology problems, and with pay increasing to $400 to $600 per week. In this greater role, Mike was still answering tech support questions, but also overseeing other moderators,

---

[1] Mike Barone met Carrasquillo in person much later when Carrasquillo traveled to Barone's apartment in Queens, New York to deliver and install equipment for Reboot and Gears.

[2] Google Hangouts is a collaboration platform where users can text or conduct voice and video chats as a group.

offering support to resellers, notifying Carrasquillo and codefendant Gonzalez[3] of any maintenance issues, and answering more challenging customer questions. Mike was also tasked a few times with installing (remotely) the servers, which were located in Canada and later in the United States, and tasked with maintaining them. This involved installing the operating system remotely from home. Mike was not entrusted to order or purchase the servers, nor negotiate prices with the server companies.

Mike researched the legalities online and found numerous articles and blogs expounding on the benefits of IPTV and discussion of the legality of streaming.[4] Gradually Mike became convinced of the rosy picture painted by Carrasquillo and others in the IPTV world—that the legality of streaming television channels through an independent service was a "gray area." More important, Mike believed—in the beginning—that Carrasquillo's service did not involve any type of recording content either through uploading or downloading onto a server, to be played back later at the time of the customer's choice. Essentially, Mike became convinced that streaming was not illegal due to the outdated provisions of the Copyright Act, and was convinced that Carrasquillo's service did not offer recorded content.

---

[3] Gonzalez entered the picture shortly after Mike Barone in 2016. He began as a moderator, like Barone, but also as a re-seller of Carrasquillo's IPTV service. Gonzalez would purchase content from Carrasquillo and then "re-sell" the content in the name of his own company, Lockdown TV, which had its own logo and accounts and which he advertised on social media. Later, in the final months before Mike Barone left, it was Gonzalez who was sending Barone his salary payments on behalf of Carrasquillo.

[4] Admittedly, a quick google search at the time would have also turned up the opposite--blogs and numerous articles from technology journals discussing the challenges for content creators in Hollywood and for cable companies to prevent pirating and the undermining of legitimate services by the newer IPTV technology available to all. These articles discussed that while recording and playback of content was illegal, streaming services—a newer development—were harder to target and penalties from prosecution were weak. These articles also elaborated on the proposed legislation in Congress which would create stronger penalties for streaming. The aforementioned legislation was passed in December 2020 as the Protecting Lawful Streaming Act, part of the larger Covid-19 Cares Act; it provided for increased penalties and was designed to target commercial, large-scale streaming of copyrighted content, including movies, television and sports events. While this legislation was not in place at the time covering the within Indictment, the conduct at issue in the Indictment was nevertheless illegal—albeit with somewhat weaker penalties for streaming.

Mike even contemplated whether he could start his own IPTV service, but eventually decided against it since he lacked the financial resources to rent servers and equipment and hire people, and more importantly, recognized that there was much about Carrasquillo's business that he didn't really understand. Meanwhile, It appeared to Mike that Carrasquillo was so flush with cash from the IPTV service that he began pouring that money into other businesses; he observed that Carrasquillo had greatly branched out to creating a thriving real estate business, buying up properties—in cash—at weekly auctions, purchasing bars and nightclubs, starting a T-shirt printing company which eventually became an entire clothing line with his own logo, and other businesses.[5] Meanwhile, Mike Barone remained as the moderator for Reboot.

As Carrasquillo's IPTV services expanded, Mike began to notice a change in Carrasquillo's demeanor. Specifically, when Mike had first been hired in 2016, he studied Carrasquillo's videos and tutorials in order to understand the IPTV service. He admired Carrasquillo's knowledge and appreciated the technological explanations provided. However, although he initially was thrilled to get paid to do something in which he already had an interest, as the company grew, and transitioned from the name Reboot to Gears, Mike observed that Carrasquillo became increasingly erratic and obnoxious—constantly posting offensive videos flashing large boxes of U.S. currency, boasting about how much money he was making, displaying garish signs of wealth in jewelry, houses, bank accounts, sports cars, exotic dancer clubs, and directly and explicitly mocking law enforcement while declaring his income legitimate and that he was untouchable from law enforcement. Then he began posting videos openly threatening people perceived as undermining him or betraying him in some way. Mike Barone became afraid. While Mike was initially enamored with Carrasquillo's brazen ability to

---

[5] The notion of Carrasquillo laundering his money into creating other businesses is not speculation on Barone's part—Carrasquillo was blatantly and constantly putting up videos and social media announcements proclaiming that he was so wealthy that he needed to invest and provided regular updates on his newest business acquisitions.

start a complex, technology-driven business with no formal educational background, he became disillusioned with Carrasquillo's persona. At some point, Mike declared to Carrasquillo that he would be leaving Gears, and that is when the threats began.

At first they were just verbal threats—Carrasquillo would become irate and irrational with Mike about silly things, acting very unstable, prompting Mike to announce that he wanted to leave the business. On several occasions this declaration was met with a response from Carrasquillo of "if you leave, I'll kill you"—and not in a joking manner. Mike became convinced that Carrasquillo was abusing drugs or was undergoing serious mental health problems, because his behavior was increasingly erratic towards Mike and everyone else. Additionally, Mike observed that while Carrasquillo's previous posted videos were styled as tutorials about IPTV and geared towards explaining the technology, Carrasquillo began posting videos to customers and followers that Mike found ridiculous—e.g. Carrasquillo posted at least four live videos of himself arriving at local banks on a Friday afternoon and making cash withdrawals of hundreds of thousands of dollars at a time, essentially flaunting that he was cleaning out the bank and obnoxiously cursing at and declaring to bank personnel that he was entitled to his own money at any time, for any reason. Mike found this behavior offensive and needless, increasing his desire to leave the business.

Thereafter, one day in the fall of 2017 when Mike left his house in Queens to walk to a local store, a car pulled up to him, a man exited while showing Mike a gun and announced "if you leave I'm gonna come back and see you." Mike was leading a quiet life at home with his father and working from home for Carrasquillo, with no other conflicts in his life and he therefore concluded that the message was being sent from Carrasquillo. In the spring of 2018, the same type of incident occurred again wherein Mike left his house and was walking up the

street when a car pulled up and a different man got out, this time pointing the gun directly at Mike and stated "we're not gonna tell you again. If you leave, we're coming back." Mike did not call the police on either occasion, fearing escalation from Carrasquillo. He continued to work for Carrasquillo, but "opened his eyes" to the person for whom he was working. He moved his ailing father out of state to another relative for a while and began setting a plan for how to leave Carrasquillo for good. He hatched a plan that he would begin antagonizing co-defendant Gonzalez through accusations and insults to the point that Gonzalez would not want Mike working for them anymore and would suggest to Carrasquillo that Mike be fired. By August of 2018, Mike announced he was leaving for good and Carrasquillo acquiesced. Approximately two months later, Mike received a text message from Carrasquillo accusing Mike (falsely) of sabotaging Carrasquillo's servers and Carrasquillo eventually stating "I'll kill you." Mike attempted to diffuse the conflict so it would die out, and although he was out of the business by that point, his fear of Carrasquillo lingered.

After Mike left, Carrasquillo and Gonzalez and others helping continued on with the business for more than a year, until the FBI executed search warrants on Omar Carrasquillo in November 2019. At that point, Carrasquillo began a counter-public relations campaign on his YouTube channel and other social media as well as in Philadelphia media interviews, declaring that he was being wrongly persecuted by the FBI and that his business was "untouchable" and "totally legal." This media charade garnered so much attention through YouTube followers and advertising fees that it made sense for Carrasquillo to continue the brazen persona for the cameras. For Carrasquillo, being in trouble with the FBI didn't hurt him—it became very lucrative in its own way.

In February 2020, the FBI contacted Mike Barone to discuss Gears TV and Mike agreed to be interviewed. Two agents came to New York and interviewed Mike alone for three hours. He asked the agents if they were aware he'd left the business more than a year before FBI conducted a raid on Carrasquillo's houses and agents confirmed they were aware. They asked Mike to explain the structure of the business, from streaming to later VOD (video on demand) and catchup features, and to explain how it all operated. He told them all about Omar Carrasquillo, Jesse Gonzalez, about his own role in Reboot and Gears, and about the threats and that the VOD and catchup features were offerings that were mainly conducted after Mike had already left.[6] The FBI did not search Mike's apartment, his phone, or seize any electronics like televisions, computers, cable boxes, or encoders. Nor did they ask to do so. To date, they never have. The equipment Mike used at home issued to him from Verizon is still at his home at this moment. It seemed to Mike that since he had already left Carrasquillo's business, law enforcement were not focused on him.

In March of 2021, the FBI contacted Mike again to set up a second interview. He met with two FBI agents in a restaurant parking lot near his residence in Queens. Thereafter, Mike briefly retained defense counsel, who then coordinated turning over to FBI--at Mike's directive—some his banking and financial records, google and Facebook records, and some passwords.

---

[6] Review of millions of documents containing text conversations, emails, social media and other communications in the Government's discovery revealed that Barone did have some limited conversation with other coconspirators about the prospect of Carrasquillo setting up video on demand (VOD) and catchup features to his IPTV service. Barone did not actively operate those features as part of his job duties, but understands that to the extent that those features were offered during certain periods of time by Gears, and were being planned out by coconspirators while Barone was still employed with Gears, such conduct would be seen as reasonably foreseeable to Barone as part of the overall conspiracy.

PROCEDURAL HISTORY

On September 16, 2021, a grand jury in the Eastern District of Pennsylvania returned a 62-count Indictment against Defendants Omar Carrasquillo, Jesse Gonzalez, and Michael Barone. Carrasquillo was charged in all 62 counts of the Indictment, Gonzalez was charged with 54 counts, and Barone was charged with six counts. Specifically, Barone was charged with Count 1 Conspiracy, in violation of 18 U.S.C. § 371, Count 2 Circumvention of an access control device, aiding and abetting, in violation of 17 U.S.C. §§ 1201(a)(1)(A), 1204(a)(1), and 18 U.S.C. § 2, and Counts 23 through 26 Access device fraud, aiding and abetting, in violation of 18 U.S.C. §§ 1029(a)(2) and 2. Thereafter, codefendants Carrasquillo and Gonzalez entered guilty pleas before this Court to numerous counts in the Indictment. On March 24, 2022, a grand jury then returned a 9-count Superseding Indictment against Defendant Barone, which eliminated two of the four counts of Access device fraud from the original Indictment, and which added five counts of Wire fraud, in violation of 18 U.S.C. § 1343.

After many months of intensive review of massive amounts of discovery,[7] and after hundreds of hours of discussion between Defendant with defense counsel and a support team, Defendant came to understand that he could be found responsible for participating in the conspiracy, even if he were not involved in all aspects of Carrasquillo's business enterprise. On August 16, 2022, Mr. Barone entered a guilty plea to Count 1 Conspiracy, specifically narrowed

---

[7] This case involved 120 terrabytes of data in the electronic discovery. A large portion of that data consisted of thousands of Hollywood movies and televisions shows, sports events, and other programming that was the subject of the copyright infringement. However, approximately 14 terrabytes of data in the discovery required actual review by the defense. For reference, one terabyte of data contains approximately 2 million pages of documents, or hundreds of social media videos.

to Conspiracy to Copyright Infringement.[8]  Stipulations of the plea agreement are correctly set forth in the Presentence report [hereinafter "PSR"].

BARONE'S ROLE AND RELATIVE CULPABILITY

The Government's evidence certainly demonstrates that for a two-year period during the conspiracy, Barone was essential to the operations of the business day-to-day by assisting customers.  However, he had no access to Carrasquillo's massive profits, and was paid strictly on a limited salary, with no proprietary interest in the company.  He also did not manage or supervise others.  Thus, pursuant to the criteria set forth in USSG §3B1.1, Barone can not be deemed a manager or supervisor, and certainly not as an organizer or leader; therefore, an adjustment <u>upward</u> would not be applicable.  Further, part of the plea agreement includes a stipulation that Defendant is entitled to a mitigating role downward adjustment, with the number of levels to be decided by the Court.  The Government asserts that Barone was a "minor participant" under § 3B1.2, and should receive a two-level downward adjustment accordingly.  Based upon the Application notes to § 3B1.2, which provide further guidance on any mitigating role adjustment, the defense submits that a 4-level downward adjustment is more appropriate, based upon the following considerations:

When Barone was hired by Carrasquillo, his activities were conducted entirely from home on his computer and his father's computer, utilizing his already existing internet and cable provider, Verizon.  Barone did not utilize technology to block Verizon from seeing what he was doing and did not encrypt anything, including the thousands of messages he exchanged with

---

[8] While not indicated in the PSR, it should be noted that Barone's guilty plea to Conspiracy did not entail Conspiracy to <u>all</u> of the many acts alleged in the Indictment; the parties narrowly tailored the guilty plea to Conspiracy to Copyright Infringement, which is really the core of Defendant Barone's illegal conduct. These specific terms are reflected in the plea agreement, as well as the Government's change of plea memorandum.

Carrasquillo, Gonzalez, Clayton, other workers of Carrasquillo, and thousands of Carrasquillo's customers. Barone also did not hide—or attempt to hide—his work in helping to process customer payments for Carrasquillo. All of these customer payments were electronically made and traceable—but directed only to Carrasquillo. Indeed, Barone did not have access to Carrasquillo's accounts in order to access profits; he was strictly a worker paid on a salary.[9] Not only did Barone not mask his activities from Verizon,[10] Verizon also did not contact Barone at any point to threaten legal action or shut down the service, or even to question his activity, nor did he ever receive a "cease and desist" directive from any of the other cable providers of this case.[11] And though Barone did not mask any of his own activities, he was aware that Carrasquillo was obscuring the description of what customers of Reboot and Gears were purchasing by labeling the service as "webhosting."

For these reasons, Barone's actions and role, in relation to that of codefendants Gonzalez and Carrasquillo, were drastically different and warrant a 4-level downward adjustment.

---

[9] Barone did have access to a website reflecting how much money, hour-to-hour, Carrasquillo's business was making from customer payments, but he could not access those funds himself. He was sometimes tasked with invoicing customers and processing their payments, which went directly to Carrasquillo's accounts.

[10] There are several different technologies that would have assisted Barone in hiding his activities from his provider Verizon, if he so desired. Examples would be conducting activities on the "dark web" utilizing Tor, a special program for users of the dark web, utilizing a virtual machine, wherein a program allows a user to install a computer within another computer, utilizing a device such as a laptop that is not registered to oneself and not purchased through traceable method, utilizing a VPN (virtual private network) that allows one to change his or her perceived location and appear to be located in another state or country. Additionally, he might pay using cryptocurrencies, gift cards or email accounts not traceable to him. Persons who engage in illegal activity online often use these and other methods to block their internet provider from seeing where they are located or their actual online activity. In this case, Barone's Verizon account was in his own name, paid by traceable electronic payments from his own accounts, and he did not utilize these other options to hide his location, nor his online activity from Verizon, nor hide which websites he was using, nor mask the ability to identify the actual device he was using. Carrasquillo, in contrast, along with Gonzalez, Mayfair (Roy Clayton) and others were purportedly utilizing a number of the aforementioned methods to hide their activities, accounts, and profits.

[11] One major point of contention is the usage of encoders. Defendant Barone had encoders set up with the various other television equipment at his apartment. These were installed by Carrasquillo. Carrasquillo also utilized encoders at all his other locations. Defendant Barone asserts that encoders <u>can</u> be used for illegal purposes, they also can and are used legally for other purposes, such as in hotels and nursing homes. More important, Barone believed that the encoders were not being used in this case in the way that the Government asserts. Barone can explain this issue more completely at the sentencing hearing if the Court inquires further.

GUIDELINE CALCULATIONS AND MOTION FOR DOWNWARD DEPARTURE

USSG § 2B5.3, Note(E) permits the Court to make a reasonable estimate using relevant data in such cases where the precise infringement amount is indeterminable. The Government has set forth one proposed method which it deems reasonable for determining the correct infringement amount of the overall conspiracy in this case. It appears the PSR officer has adopted this approach as a reasonable method. The defense does not dispute this initial method for calculating overall conspiracy infringement amounts, which results in an overall infringement amount for the conspiracy of $167,817,004.60. Further, as outlined in the PSR, Barone's involvement in the conspiracy ended more than one year before the others, and for the reasons explained in the PSR, reseller data should be excluded from calculations pertaining to Barone; therefore, from the overall conspiracy infringement amount of $167,817,004.60, Barone's portion is assigned at $64,912,444.52.

However, as carefully contemplated by the parties in reaching their plea agreement, Defendant should be entitled to a significant downward departure because the aforementioned amount of more than $64 million greatly overstates Barone's actual culpability and relative to his two codefendants. As the Government points out, the Guidelines specifically contemplate this. USSG 2B5.3. Since Barone enjoyed no proprietary interest in Reboot/Gears or any of Carrasquillo's other businesses, the financial gains of Gonzalez and Carrasquillo are starkly different than the salary paid to Barone. The parties therefore agreed that the actual salary paid to Barone of $122,402 is an appropriate infringement amount to assign to Barone, which would lead to an 8-level (rather than 14-level) upward adjustment added to his base offense level of 8.

Additionally, the defense does not dispute the adjustment of two points upwards, pursuant to section 2B5.3(b)(3), as set forth in the PSR.

With the initial base offense level of 8, then adding 8 levels based on the $122,402 gain as a proxy for the infringement amount, and two additional levels under 2B5.3(b)(3), Defendant's offense level would be 18. As a minimal participant for the reasons explained above, he would receive a 4-level reduction, along with an additional 3 levels downward for his timely acceptance of responsibility, placing him at a total offense level of 11.

An offense level of 11 with criminal history category of I provides a guideline range of 8 to 14 months. The defense respectfully requests that the Court grant its Motion for Downward Departure to this advisory guideline range.

SENTENCING ARGUMENTS

There is no mandatory minimum applicable in this case and the statutory maximum is five years. If the Court grants the aforementioned request for downward departure, the new Guideline range then becomes 8-14 months. The Court is then faced with whether a sentence in that new guideline range is appropriate, and whether a variance from that guideline range is also warranted. To that end, the defense points out that U.S. v. Booker, 125 S.Ct. 738 (2005) has rendered the federal sentencing Guidelines "effectively advisory." 125 S.Ct. at 757. The Supreme Court has made clear in Rita v. United States, 127 S.Ct. 2456 (2007), Kimbrough v. United States, 128 S.Ct. 558 (2007), and Gall v. United States, 128 S.Ct. 586 (2007) that section 3553(a) is the controlling sentencing law and rejects the methods used after Booker to maintain any *de facto* mandatory guideline system. The Guidelines, "formerly mandatory, now serve as

13

one factor among several courts must consider in determining an appropriate sentence." Gall, 128 S.Ct. at 602. The Gall and Kimbrough decisions expressly rejected mindless uniformity to the Guidelines. Further, it is no longer permissible for reviewing courts to apply percentage or mathematical calculations based on the distance from the Guideline range, or to require "extraordinary" circumstances to justify departures or variances. Gall, 128 S.Ct. at 595.

Instead, this sentencing court is required to consider the Guideline ranges, but is permitted to tailor a sentence in light of other statutory factors. The factors that must be considered are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed;

(3) the kinds of sentences available;

(4) the guidelines and policy statements issued by the Sentencing Commission, including the guideline range;

(5) the need to avoid unwarranted sentencing disparity; and

(6) the need to provide restitution where applicable.

18 U.S.C. §3553(a)(1-6).

Neither the statute nor Booker suggests that any one of these factors is to be given greater weight than any others. However, all factors are subservient to section 3553(a)'s mandate to impose a sentence not greater than necessary to comply with the four purposes of sentencing.

With those guiding principles, the defense believes and avers that a variance based upon Defendant's personal history and characteristics is warranted, for the following reasons:

1) Upon his Indictment, Defendant was directed to and immediately surrendered to the U.S. Marshals. He has been released on bond for the past 1 ½ years and has been in total compliance with Pretrial Services;

2) Some defendants have a Criminal History Category of I but actually have a significant history of contacts with law enforcement and/or have prior convictions but not enough to exceed Category I. Defendant Barone has a Criminal History Category of I with literally NO prior record and no criminal history points;

3) Michael Barone is 36 years old and has spent his entire life trying to avoid the serious criminal activity occurring all around him in New York, preferring to live a quiet life in a modest apartment in Queens, New York with his father;

4) Defendant will owe more than $122,000 in restitution, and given his modest income to date, it will likely take him the rest of his adult life to pay off that amount of restitution. For someone in his position, this is a monstrous financial burden and quite punitive on its own;

5) Defendant resides with and is the caretaker of his disabled father in Queens, New York. Defendant manages his father's care, plus all the household duties. If he is incarcerated for a lengthy period, his absence will cause significant impediments for his father;

6) Barone is very intelligent and more than capable of maintaining employment. Although the PSR suggests there may be some history of minor drug usage and some need for possible mental health treatment, it is the opinion of within defense counsel that these issues will not interfere with his ability to work and to function. His law abiding lifestyle up to the instant offense, and his overall stability and demonstrated

compliance with Pretrial Services suggest that he is an excellent candidate for community supervision.

The most accurate depiction of what Defendant actually did here is that he took a job "under the table" so he could work from home, doing tech support for a newly developed company in a newly developed area of technology. He failed to adequately research and understand the legalities of the business—or perhaps, more accurately, turned his head away from recognizing that the business was questionable. He saw a chance to easily make money while working from home and taking care of his father. As he gained more understanding of the person he worked for, he realized the business—and the boss—was not a company that he wished to be connected with. In spite of threats to his safety if he left, he did eventually leave. While the business was massively lucrative for Carrasquillo, Gonzalez, and perhaps a few others, Barone was kept on the outside of the profits and the planning, including the massive money laundering.

At the sentencing hearing, the defense intends to present the testimony of Defendant and his parents. These individuals are best equipped to address the history and characteristics of Defendant that will enable the Court to decide whether a variance from the Guideline range is warranted. This Court has only had one interaction thus far with Defendant Barone (at his change of plea hearing). The defense requests that the Court give careful consideration to the arguments herein of counsel, and the testimony presented at sentencing related to Defendant's background.

Defendant additionally requests that if the Court is inclined to incarcerate Mr. Barone, that the Court consider home confinement with electronic monitoring in lieu of outright incarceration.

The defense believes that the evidence presented at sentencing, along with arguments contained herein will, collectively, give the Court ample reason to vary from the Guideline range and impose a sentence that reflects the seriousness of the offense while balancing the needs of Defendant and the community.

Respectfully submitted,

s/KER 7292
KATHRYN E. ROBERTS, ESQUIRE
527 Hamilton Street
Allentown, Pa 18101
(484) 695-7023 (PH)
(484) 714-0901 (fax)
KathrynRoberts_Esquire@yahoo.com
www.AllentownCriminalLaw.com
Pa  ID # 82739

## CERTIFICATE OF SERVICE

I, Kathryn Roberts, Esquire, counsel for Defendant, hereby certify that I have served by email a copy of the Defendant's Sentencing Memorandum upon Matthew Newomer, Esquire, Assistant United States Attorney, Suite 1250, 615 Chestnut Street, Philadelphia, PA 19106-4476 and by email/fax upon The Honorable Harvey Bartle III, 16614, United States Courthouse, 601 Market Street, Philadelphia, Pa 19106.

s/KER7292
KATHRYN E. ROBERTS, ESQUIRE

Date:   February 1, 2023